**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA JOYCE-DEEGAN | ) | CASE NO.    1:12-cv-2356 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | MEMORANDUM OF OPINION |
| Defendant. | ) | |

This case is before the magistrate judge by consent.  Plaintiff, Patricia Joyce-Deegan ("Deegan"), challenges the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying Deegan's application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i).   This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the court REVERSES the decision of the Commissioner remands the case for further action consistent with this opinion.

I.  Procedural History

Deegan filed an application for DIB on November 17, 2008, alleging disability as of May 2, 2007.  Deegan's application was denied initially and upon reconsideration.  She timely requested an administrative hearing.

Administrative Law Judge Kevin W. Fallis ("ALJ") held a hearing on February 15, 2011.  Deegan, represented by counsel, testified on her own behalf at the hearing.

Mark Anderson testified as a vocational expert ("VE").  The ALJ issued a decision on April 13, 2011, in which he determined that Deegan is not disabled.  Deegan requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on July 26, 2012, the ALJ's decision became the final decision of the Commissioner.

Deegan filed an appeal to this court on September 20, 2012.  She alleges that the ALJ erred because (1) the ALJ failed to give substantial weight to the opinions of her treating physicians; and (2) the ALJ's residual functional capacity ("RFC") findings were not supported by substantial evidence.  The Commissioner denies that the ALJ erred.

## II.  Evidence

*A.    Personal and Vocational Evidence*

Deegan was born on April 25, 1955 and was 55 years old on the date of her hearing.  She graduated college with a degree in business administration and has past relevant work as a bookkeeper.

*B.    Medical Evidence*

On August 1, 2007, Deegan was hospitalized complaining of right-hand numbness and drooping and numbness on one side of her face.  Tr. at 287-97.  The symptoms lasted for one hour.  An MRA revealed chronic, small vessel ischemic changes.  The treating physician diagnosed a transient ischemic attack, tobacco use, hyperlipidemia, and anxiety.  The physician prescribed Zocor, aspirin, Ativan, and Celexa.

Diana Dale, M.D., diagnosed Deegan as suffering from bipolar disorder as early as August 1, 2007, and this was a continuing diagnosis.  Tr. at 299-304, 433-42.  At

2

various times between November 2007 and September 2009, Deegan reported crying

spells, depression, anxiety, flat affect, difficulty thinking, difficulty concentrating, difficulty

sleeping, nightmares, and a lack of motivation.  She also complained of fibromyalgia

and an inability to sit for more than four hours due to slipped discs.  In addition, Deegan

reported being unable to do things for long periods of time.  Medications were switched

at times to reduce side effects, which included outbursts of anger, blurred vision,

stuttering, and weight gain.  Deegan alternated between periods of depression and

periods of improvement.  She told Dr. Dale that she could not see herself working full-

time.

On December 18, 2007, an MRI of Deegan's cervical spine revealed a

straightening of the normal cervical lordosis and some minimal sponylolisthesis at C3-4

and C4-5, moderate to severe disc space narrowing at C5-6 and C6-7, moderate disk

space narrowing elsewhere in the cervical spine, mild degenerative endplate changes in

the marrow at C5-6 through C7-T1, and mild osteophyte formation at C5-6.  Tr. at 240-

41.  The interpreting physician diagnosed cervical degenerative disc disease with mild

canal stenosis.  On December 28, 2007, after Deegan complained of pain, she

underwent an x-ray of the lumbar spine.  Tr. at 281-82.  The interpreting physician found

narrowing of the L4-5 and L5-S1 disk spaces with subchondral sclerosis and spurring at

the L4-5 and L5-S1 levels suggestive of degenerative disc disease.  A

contemporaneous x-ray of both hands and wrists revealed sclerotic and erosive

changes at the first carpometacarpal joint of the left hand, minor changes present at the

second and third proximal interphalangeal joints of both hands and the distal

interphalangeal joints of the first and second digits of the right hand, and minor changes

3

at the second and third distal interphalangeal joints of the left hand.  Tr. at 283.  The interpreting physician found these changes most probably related to degenerative arthritis.  X-rays of the thoracic spine and knees taken at the same time revealed minimal spurring. Tr. at 284, 413.

Deegan sought treatment from Christiana M. Boieru, M.D., a rheumatologist, between January from January 14, 2008 through August 10, 2009.  Tr. at 419-29. Deegan repeatedly complained of generalized pain, sleep disturbance or fatigue, tender points, and thumb or hand pain.  She also reported upper right hand numbness, low back pain, stiffness in her knees and neck, and a discrepancy in the length of her legs. Dr. Boieru diagnosed fibromyalgia, osteoarthritis in the hands, and deQuervain's syndrome.  Dr. Boieru advised Deegan to try Pilates and increase her exercise.

Dr. Boieru referred Deegan to Michael J. Shlonsky, D.P.M., a podiatrist, for an evaluation.  Tr. at 243-44.  On January 22, 2008, Deegan visited Dr. Shlonsky.  She reported her current medications as being citalopram, lorazepam, and an NSAID.  She also reported that up until two months ago just had suffered from foot pain that was so bad that she could not walk but that Lyrica gave her "great relief."  Tr. at 244.  Upon examination, Dr. Shlonsky concluded that the length of Deegan's legs differed due to hip tilt and prescribed a heel lift as a temporary measure until he could obtain authorization for an orthotic.

On May 13, 2008, Deegan underwent an occupational therapy evaluation at Fairview Hospital Wellness Center upon referral from Dr. Boieru.  Tr. at 248-51.  The evaluation found reduced flexion and extension in both wrists and thumbs; reduced strength, particularly in the left hand; and difficulties with manipulation.  Deegan also

4

reported pain upon opening jars, writing, painting, tying shoe laces, and pulling up her pants.  Subsequent to the evaluation, the therapist and Deegan set goals of increasing range of motion in the thumbs, increasing grip and pinch strength, decreasing pain, increasing coordination in the thumbs, and decreasing edema in the thumbs.

On October 21, 2008, Deegan underwent an occupational therapy evaluation at Fairview Hospital Wellness Center for osteoarthritis and pain in the thumbs bilaterally. Tr. at 246-47.  Deegan reported that was unable to turn the dial on the laundry machine, had difficulty cutting her food, and had difficulty holding, pinching, cutting, vacuuming, and performing other household chores.  After the evaluation, the therapist recommended that Deegan be fitted with a steel splint for her hand.

From February 7, 2009 through November 10, 2010, Deegan received chiropractic treatments for lower back, neck, and shoulder pain at the Optimal Wellness Center.  Tr. at 547-51.

On February 17, 2009,  Caroline Lewin, Ph.D., completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique evaluating Deegan's mental capabilities.  Tr. at 305-23.  Dr. Lewin expressed dissatisfaction with the record, noted Deegan's reported changes in ability to function, and concluded that a number of issues in the record needed to be clarified.  Nevertheless, Dr. Lewin opined that Deegan suffered from an bipolar syndrome and was moderately limited in the ability to understand and remember detailed instructions; moderately limited in the ability to carry out detailed instructions; moderately limited in the ability to maintain attention and concentration for extended periods; moderately limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary

5

tolerances; moderately limited in the ability to work in coordination or proximity with others without being distracted by them; moderately limited in the ability to make simple work-related decisions; moderately limited in the ability to complete a normal workday and workweek without interruption from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; moderately limited in the ability to accept instructions and respond appropriately to criticism from superiors; and moderately limited in the ability to respond appropriately to changes in the work setting.  With respect to functional limitations, Dr. Lewin opined that Deegan was mildly restricted in her activities of daily living; had moderate difficulties in maintaining social functioning; had moderate difficulties in maintaining concentration , persistence, and pace; and no episodes of decompensation of extended duration.  Dr. Lewin concluded:

> [T]he clmt does have some limitations but . . . significant functional capacity remains.  The clmt is able to comprehend, remember, and carry out simple task instructions.  Her depression may interfere with detailed directions, but she can perform some multi-step tasks if given a bit of time.  She can maintain adequate attention to complete simple tasks and make dimple decisions.  She would have no difficulties interacting with others on a superficial basis.  She can adapt to a setting in which duties are routine and predictable & in which a fast production pace is not required.
>
> Clmt's allegations are slightly obverstated [sic], reducing credibility slightly.  There are no actual work related functional conclusions by the [treating source].

Tr. at 308 (abbreviations in the original).

Deegan underwent psychological counseling from March 2, 2009 through December 18, 2009 with Diana Mueller, LPCC.[1]  Tr. at 358-405, 481-90.  At the start of

---

1 Deegan had earlier undergone counseling with Mueller in 2005-06.  Tr. at 386.

counseling, Deegan complained of fatigue, sleeplessness and nightmares, depression, feelings of hopelessness and helplessness, difficulties concentrating, loss of interest in sex, and fibromyalgia.  Tr. at 387.  Mueller diagnosed Deegan as suffering from bipolar disorder, fibromyalgia, and arthritis and assigned her a Global Assessment of Functioning ("GAF") of 60.[2]  Mueller set treatment goals that included decreasing symptoms of depression and anxiety.  Current medications included Cymbalta, Abilify, Meloxicam, and Trazadone.  Mueller found Deegan to be normal in dress and hygiene, oriented times three, having memory and sensorium intact, displaying normal affect, expressing depressed and anxious mood, having logical thought processes, displaying good insight and judgment, and having normal motor behavior and speech.  Over the course of treatment, Deegan frequently reported being depressed, anxious, or sad.  She also reported nightmares, anger toward her father, difficulty concentrating and sleeping, irritability, an inability to draw, and a tendency to "beat herself up."  Clinical notes repeatedly showed slight improvement in most sessions.

On March 28, 2009, Wilfredo Paras, M.D., examined Deegan at the request of the Bureau of Disability Determination.  Tr. at 325-31.  Deegan told Dr. Paras that she had fibromyalgia, depression, bipolar disorder, and arthritis.  Deegan reported difficulty sleeping due to nightmares, anxiety and panic attacks, although she also reported that she no longer suffered from mood swings because her medication controlled them.  According to Deegan, she did not take medication for her fibromylagia, but her doctor

---

2  A GAF of between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

advised her to exercise, avoid stress, and take vitamins.  During the winter, "she does not feel good" due to fibromylagia.  Tr. at 325.  Deegan did take medication for arthritis, which was manifested primarily in pain and swelling in her thumbs, particularly her right thumb.  She was prescribed immobilizers for both thumbs, and she reported currently wearing the immobilzer for her right thumb except when she slept.  Arthritic pain in her neck and pain sometimes bothered her, especially in the winter.

Deegan reported that she did light household chores, drew portraits twice a week for an hour at a time, read, and watched television.  She tried to see her father and grandchildren once a week and went out occasionally with her husband.  She also reported stiffness and soreness in her low back and neck after sitting for an hour; soreness and stiffness in her low back, neck, and feet after standing for about an hour; "tolerable" ability to bend; an ability to walk a mile for exercise three times a week; an ability to lift and carry up to five to ten pounds with both hands; and an ability to walk up and down stairs.  She listed her current medications and supplements as Lorasepam, Citolopram, Ability, Trazadone, Gabapentin, Meloxicam, Simvastatin, Prilosec, vitamin D, fish oil, and Centrum Silver.

Dr. Paras observed that Deegan had no problem with hearing or speaking and was able to concentrate and understand fairly well.  He found Deegan to be alert, oriented, coherent; without abnormal behaviors, pleasant and cooperative, walking normally without an assistive device, and without respiratory distress.  Physical examination detected no abnormalities, except pain in the right lower back upon limited range of motion and pain in the right thumb upon limited range of motion and right hand dynamometry.  Dr. Paras concluded, "[B]ased on the history and objective findings this

8

claimant's ability to perform work-related physical activities are [sic] limited by muscle achyness [sic] and joint pains.  Her depressive disorder is a contributory factor in her ability to perform mental and work-related physical activities."  Tr. at 326.

On April 15, 2009, W. Jerry McCloud, M.D., completed a Physical Residual Functional Capacity Assessment of Deegan.  Tr. at 332-39.  Dr. McCloud opined that Deegan could lift or carry 20 pounds occasionally, lift or carry 10 pounds frequently, stand or walk for about six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and push or pull without limitation.  He further opined that Deegan should never climb using ladders, ropes, or scaffolds; should only occasionally kneel or crouch; and was limited in her ability to engage in fine manipulation.  Dr. McCloud added the following to his assessment:

> Clmt alleges she can't use her hands for typing or writing for any length of time. Recent P.E. shows normal ROM & strength in both hands with the exception of pain in her R thumb.  This would not preclude her from all writing or typing.  Also alleges she can't sit at a desk for more than an hr any time of day & while her impairments would affect her sitting the evidence doesn't support limiting it to such a significant degree.  Clmt's alleged severity is not consistent with the overall evidence, statements considered partially credible.

Tr. at 337 (abbreviations in the original).

On March 31, 2009, x-rays of Deegan's hands revealed that her condition was not significantly changed since her last x-ray.  Tr. at 408.

In May 2009, Dr. Mehrun K. Elyaderani, M.D., performed a right carpometacarpal ("CMC") arthoplasty on Deegan's right wrist to alleviate her pain.  Tr. at 341, 350-51, 352-55.  Although Deegan suffered a slight loss of sensation distal to the incision, x-rays revealed that the surgery was otherwise successful in aligning her CMC joint and relieving pain.  Dr. Elvaderani prescribed physical therapy after her surgery.

9

Deegan participated in physical therapy from May 28, 2009 through July 6, 2009. Tr. at 587-618.  Dr. Elyaderani evaluated Deegan's progress on June 29, 2009 as follows:

> On exam the patient has pretty good motion.  She still has a little bit of difficulty on flexing completely.  The pain and discomfort she had before has [sic] since resolved and she is doing very well in that regard.  The patient . . . has ability to flex and extend the fingers and I believe is doing well enough that she should be able to return to the painting activity that she does quite well.  She is extremely pleased with the result at this point and will do stretching on her own and follow up p.r.n.

Tr. at 586.  Upon Deegan's discharge from therapy on July 6, 2009, the therapist recommended additional therapy.  Tr. at 588.

On June 15, 2009, Dr. Elyaderani completed a Medical Source Statement: Patient's Physical Capacity assessing Deegan's physical abilities.  Tr. at 356-57.  Dr. Elyaderani opined that, at present, Deegan was able to lift five pounds occasionally and three pounds frequently.  He added, however, that as Deegan recuperated from surgery, she would be able to lift up to 20 pounds after six months.  He found that standing, walking, and sitting were not affected by her impairment.  Dr. Elyaderani also limited Deegan to only rarely engaging in fine manipulation and only occasionally handling, pushing or pulling, or engaging in gross manipulation.  He also noted that a brace and therapy had been prescribed.  He found no additional factors that would interfere with an eight-hour a day, five-day a week workweek.

On June 25, 2009, Mueller noted that Deegan had reported nightmares, waking up several times at night, fatigue, anxiety, anhedonia, difficulty getting started or leaving home, and periods during which she would "zone out."  Tr. at 405.

On July 14, 2009, Dr. Dale completed a Medical Source Statement: Patient's

10

Mental Capacity assessing Deegan's mental capabilities.  Tr. at 431-32.  Dr. Dale

opined that Deegan had little or no ability to maintain attention and concentration for

extended period of two-hour segments; little or no ability to respond appropriately to

changes in a routine setting; little or no ability to deal with the public; little or no ability to

relate to co-workers; little or no ability to interact with supervisors; little or no ability to

function independently without special supervision; little or no ability to deal with work

stresses; little or no ability to complete a normal workday and workweek without

interruptions from psychologically-based symptoms and perform at a consistent pace

without an unreasonable number and length of rest periods; little or no ability to

understand, remember, and carry out complex job instructions; little or no ability to

behave in an emotionally stable manner, and little or no ability to relate predictably in

social situations.  She also opined Deegan had only a fair ability to follow work rules, a

fair ability to use judgment, a fair ability to maintain regular attendance and be punctual

within customary tolerances, a fair ability to work in coordination with others without

being unduly distracted or distracting, a fair ability to understand, remember, and carry

out detailed, but not complex, job instructions; a fair ability to understand, remember,

and carry out simple job instructions; a fair ability to maintain appearance; a fair ability

to socialize; a fair ability to manage funds or schedules; and a fair ability to leave home

on her own.  Dr. Dale included ten pages of clinical notes in support of her assessment.

On July 23, 2009, Mueller completed a Mental Status Questionnaire assessing

Deegan's mental condition.  Tr. at 359-61.  Mueller reported that she had seen Deegan

from September 21, 2005 through July 22, 2009.  Mueller described Deegan's affect

sad, depressed, and anxious, with her anxiety exhibited in a tendency to reclusiveness,

having to be forced to socialize, and experiencing anxiety attacks several times a week. Deegan's cognitive functioning was limited by trouble concentrating, difficulty with short term memory, and a difficulty in focusing on accuracy.  According to Mueller, Deegan's anxiety and depression affected her ability to make good decisions.  Moreover, Deegan had trouble with short-term memory, with her ability to focus and concentrate, with her attention span, and with her ability to persist in tasks.  In response to how Deegan would react to the pressures of simple, routine, or repetitive tasks in a work setting, Mueller replied that Deegan "become[s] anxious almost to the point of disorientation. When she takes medication for anxiety[, she] has troubles staying awake, alert."  Tr. at 360.

Dr. Dale's clinical records from November 19, 2009 through December 28, 2010, tr. at 433-41, 537-44, reveal that Deegan had anxiety issues that were sometimes disorienting and made her forgetful.  At various times, Deegan reported that she was tired, agitated, irritated by her husband, worried about memory loss, fearful, had no motivation, and did not like herself.  At other times, Deegan reported feeling better.  Dr. Dale again diagnoses Deegan as suffering from bipolar disorder. Tr. at 537-544, 552-553, 620.  Similarly, progress notes written by Mueller between December 18, 2009 and December 21, 2010, tr. at 481-90, 568-79, find Deegan reporting depression, anxiety, panic attacks, nightmares, tearfulness, tiredness, worries about memory loss, and feeling overwhelmed.

From May 19, 2010 through May 27, 2010, Deegan was hospitalized for worsening depression.  Tr. at 491-93.  Her discharge summary noted that Deegan had experienced worsening depression for the previous year and a half, characterized by

12

poor sleep, poor interest, decreased energy, little motivation, and hopeless and helpless thoughts.  These symptoms led to suicidal thinking, including thoughts of leaving the car running in a garage for carbon monoxide poisoning.  Deegan, however, denied suicidal ideation, auditory or visual hallucinations, delusions, or ideas of reference.  Her medications were changed, and Deegan underwent electroconvulsive therapy ("ECT").  Her condition improved.  Upon discharge, Deegan was diagnosed with a moderate to severe major depressive disorder with suicidal ideations and with fibromylagia.  The attending physician assigned her a GAF of 60.

On June 29, 2010, Dr. Dale completed a second Medical Source Statement: Patient's Mental Capacity assessing Deegan.  Tr. at 545-46.  Dr. Dale opined that Deegan had little or no ability to follow work rules, little or no ability to maintain attention and concentration for extended period of two-hour segments; little or no ability to respond appropriately to changes in a routine setting; little or no ability to maintain regular attendance and be punctual within customary tolerances; little or no ability to interact with supervisors; little or no ability to function independently without special supervision; little or no ability to work in coordination with or proximity to others without being unduly distracted or distracting; little or no ability to deal with work stresses; little or no ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; little or no ability to socialize; little or no ability to behave in an emotionally stable manner, and little or no ability to related predictably in social situations.  She also opined Deegan had only a fair ability to use judgment; a fair ability to deal with the public; a fair ability to relate to co-workers; a fair

13

ability to understand, remember, and carry out complex job instructions; a fair ability to understand, remember, and carry out detailed, but not complex, job instructions; a fair ability to understand, remember, and carry out simple job instructions; a fair ability to maintain appearance; a fair ability to socialize; a fair ability to manage funds or schedules; and a fair ability to leave home on her own.  Dr. Dale noted a poor response to psychotropic medications and a temporary response to ECT.

*C.  Hearing Testimony*

At the administrative hearing, Deegan testified that she is right-handed, lives with her husband, and has difficulties using stairs in her home because of pain in her lower back and knees.  Tr. at 40-41.  Her driver's license was renewed on April 23, 2008, and she stated that she drives a couple times a week for five or ten minutes at a time.  Tr. at 41-42.  Deegan said that she drove to the hearing, which took about 20 to 22 minutes. Tr. at 42-43.  According to Deegan, when she drives for too long, her back hurts and becomes stiff, and she cannot look over her shoulder.  Tr. at 43. Also, she said that her right hand goes numb, which requires her to switch hands.  Tr. at 43.

Deegan told the court that she had worked as a bookkeeper from 1993 through 2007, when she was fired because she could not switch from part time to full time due to her back.  Tr. at 44-45.  She also worked briefly in 2009, but she stopped by mutual consent because she "couldn't keep track of anything," had trouble focusing, and had problems with payments.  Tr. at 46-47.

Deegan testified that she drew about once a month for up to 45 minutes at a time.  Tr. at 46-47.  According to Deegan, after that her hand goes numb, and she has to wait several hours before she can draw again.  Tr. at 48.

14

Deegan told the court that the pain from her arthritis flares up several times a year, particularly in her knees, lower back, hands, shoulders, upper neck, and bottoms of her feet.  Tr. at 51-53.  Her lower back always bothers her, and the pain can reach eight or nine on a ten-point scale.  Tr. at 53.  Normally, Deegan takes Tylenol or aspirin for pain, but if it gets pain she goes to the doctor for hydrocodone.  Tr. at 54.  She tries not to take hydrocodone, however, because it is addictive.  Tr. at 54-55.  Deegan also testified that she suffered from pain due to fibromyalgia.  Tr. at 56.  According to Deegan, that pain is worst in the winter, when the pain reaches eight on a ten-point scale.  Tr. at 56.  Since her surgery, her pain in her right hand has been much reduced, appearing only when she tries to hold a pen or pencil too long or open a jar.  Tr. at 56.  When she does overexert with her right hand, the pain reaches an eight or nine on a ten point scale and her thumb goes numb.  Tr. at 57.

Deegan estimated that she could sit for up to 20 minutes to an hour, depending upon the day, before needing a 15 to 20 minute break.  Tr. at 58-59.  She also estimated that she could walk or stand for 20 minutes before needing to rest her lower back or feet and could briefly lift 20 pounds.  Tr. at 59-60.  Deegan testified that her husband did most of the cooking and shopping and that she did dishes and some laundry.  Tr. at 61.  Her husband also grooms the dog.  Tr. at 68.  She did not vacuum, dust, or do yardwork, but she walked the dog about 20 minutes a day.  Tr. at 61-62, 68.  She had no significant difficulty dressing and used the computer to some extent.  Tr. at 62-63.  She also watched television and was able to read for 20 minutes at a time before losing focus..  Tr. at 64-65.  Deegan told the court that she had nightmares that disturbed her sleep, so she usually napped in the afternoon.  Tr. at 64-65.

15

Deegan testified that she usually met her family every Friday at Happy Hour and that she visited friends about three times a year.  Tr. at 66.  Her grandchildren visit about once a week, and her sons visit about twice a month.  Tr. at 67.  She went to mass once a week and went out once a week with her husband.  Tr. at 65-66.  Four years prior to the hearing, she vacationed in a cottage for a week, and the following year she went to the Grand Canyon.  Tr. at 68.  She married her husband about three years prior to the hearing while on a cruise.  Tr. at 69.

Deegan told the court that she had crying spells almost every day and that her depression was worse in the winter.  Tr. at 70-71.  She also said that she didn't wear her prescribed orthotic for her foot because her doctor was never able to fit it properly and it aggravated her back problems.  Tr. at 72.  Finally, Deegan said that, according to her doctors, she probably should have surgery on her left hand, but she had not done anything about that.  Tr. at 72-73.

The VE testified that Deegan had primarily worked as a bookkeeper or accountant, a sedentary occupation, and that her skills would not transfer to another job.  Tr. at 76-77.  The ALJ asked the VE to assume an individual of Deegan's age, education, and work experience who was able to perform light work or lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, stand or walk for about six hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  Tr. at 77.  The ALJ added that the assumed individual could not climb ladders, ropes, or scaffolds; could occasionally stoop or crouch; could only occasionally finger or engage in fine manipulation; was limited to simple, routine, and repetitive tasks without fast-paced production requirements; simple work-related decisions and routine workplace

16

changes; and only superficial and indirect contact with the public and only superficial contact with co-workers.  Tr. at 77.  When the ALJ asked if such an individual could perform Deegan's past work, the VE testified that such an individual could not.  Tr. at 77-78.  When asked if there was work in the national economy that such an individual could perform, the VE answered that there was.  Tr. at 78.  Those jobs included paint inspector, laboratory sample carrier, and mail sorter.  Tr. at 78-79.

The ALJ then asked the VE to assume an individual of Deegan's age, education, and work experience who was able to perform light work or lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, stand or walk for about six hours in an eight-hour workday, and sit for six hours in an eight-hour workday, who could only occasionally push or pull with the upper right extremity; could occasionally engage in gross manipulation with the upper right extremity; could never perform fine manipulation with the upper right extremity; and was limited to frequent feeling with the upper right extremity.  Tr. at 79.  The ALJ added that the individual was limited to simple, routine, and repetitive tasks without fast-paced production requirements; simple work-related decisions and routine workplace changes; and only superficial and indirect contact with the public and only superficial contact with co-workers.  Tr. at 79-80.  When the ALJ asked if such an individual could perform Deegan's past work, the VE testified that such an individual could not.  Tr. at 80.  When asked if there was work in the national economy that such an individual could perform, the VE answered that such an individual could perform the jobs of paint inspector and mail sorter mentioned earlier and filling and closing machine tender.  Tr. at 80.

The ALJ next asked the VE to assume the individuals in the first two

17

hypotheticals but with the additional limitation that they would be off-task 20% of the time in addition to their regular breaks.  Tr. at 81.  When asked if there would be work for such an individual, the ALJ answered that there would not be.  Tr. at 81.  Finally, the ALJ asked the VE to again assume the hypothetical individuals in the first two questions but with the additional limitation that they would miss two days of work a month.  Tr. at 81.  When asked whether there would be work for such individuals, the VE replied that there would be work for such individuals but there would not be if the individuals missed three days a month.  Tr. at 81-82.

Deegan's attorney asked the VE to assume the individuals in the first and second hypotheticals but with the additional limitations that the individual would need a sit/stand option every 20 minutes and could perform fine and gross manipulation with the left hand only occasionally.  Tr. at 82.  When asked whether there would be work for such individuals, the VE replied that there would not be work for the individual in the second hypothetical and there would be only a limited number of jobs for the individual in the first hypothetical.  Tr. at 82.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain

18

income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second,  the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In determining that Deegan was not disabled, the ALJ made the following relevant findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 21, 2012.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR §404.1571 *et seq.*).

3.  Since the alleged onset date of disability, May 2, 2007, the claimant has

19

had the following severe impairments: major depressive disorder, cervical degenerative disc disease, lumbar degenerative disc disease, fibromyalgia, and arthritis (20 CFR §404.1520(c)).

4.  Since the alleged onset date of disability, May 2, 2007, the claimant has not had an impairment or combination of impairments that meets one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §404.1520(d), §404.1525 and §404.1526).

5.  After careful consideration of the entire record, the undersigned finds that since May 2, 2007, the claimant has the residual functional capacity to perform a reduced range of light work with the following limitations:  the claimant can lift and carry 10 pounds frequently and 20 pounds occasionally; she can stand or walk for 6 hours and sit up to 6 hours in an 8-hour workday; she can occasionally push, pull, and handle with the right upper extremity; she can frequently reach and feel (i.e. engage in gross manipulations) but never finger (i.e. engage in fine manipulations) with the right upper extremity; her work is limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decision and routine work place changes; she will not have any interaction with the public; she can work around co-workers throughout the day but her interaction with co-workers will be only occasional and superficial.  (*See generally* 20 CFR §404.1567(b).)

6.  Since May 2, 2007, the claimant has been unable to perform any past relevant work (20 CFR §404.1565).

7.  Prior to the established disability onset date, the claimant was an individual closely approaching advanced age.  On April 25, 2010, the claimant's age category changed to an individual of advanced age (20 CFR §404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR §404.1564).

9.  Prior to April 25, 2010, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not she has transferable job skills.  Beginning on April 25, 2010, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart, P, Appendix 2).

10. Prior to April 25, 2010, the date the claimant's age category changed, considering her age, education, work experience, and residual functional

capacity, there were jobs that existed in significant numbers in the national economy that she could have performed (20 CFR §404.1569 and §404.1569a).

11.    Beginning on April 25, 2010, the date the claimant's age category changed, considering her age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that she could perform (20 CFR §404.1560(c) and §404.1566).

12.    The claimant was not disabled prior to April 25, 2010, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR §404.1520(g)).

Tr. at 19-27.

## V.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Commissioner of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) (holding that the "decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *see also Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Deegan alleges that the ALJ erred because (1) the ALJ failed to give substantial

weight to the opinions of her treating physicians, and (2) the ALJ's RFC findings were not supported by substantial evidence.  The Commissioner denies that the ALJ erred.

A.      *Whether the ALJ erred in failing to give the opinions of Deegan's treating physicians substantial weight*

Deegan argues that the ALJ erred in failing to give controlling weight or great weight to the opinions of two of Deegan's treating physicians, Drs. Dale and Elyaderani. The Commissioner denies that the ALJ erred in this respect.

The opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986).

The ALJ must provide "good reasons" for the weight assigned to treating physicians.  20 C.F.R. § 404.1527(d)(2).  Failure to do so is not harmless error and requires remand. *Wilson v. Commissioner of Social Security*, 378, F.3d. 541, 544 (6th. Cir. 2004).  "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors—namely, the length of the treatment relationship and the

frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion." *Id.*

In the present case, Deegan maintains that the ALJ erred by failing to give controlling or great weight to the opinions of Drs. Dale and Elyaderani because the ALJ (1) failed to consider the required factors in determining the weight to be given to Dr. Dale's opinions; and (2) erroneously relied only on selected portions of Dr. Elyaderani's RFC assessment.

The ALJ's opinion refers to Dr. Dale twice.  The first time, the opinion noted, "On May 19, 2010, the claimant's treating and licensed psychiatrist Diana Dale, M.D. recommended that she be admitted to Lutheran Hospital for in-patient treatment until May 27, 2010."  Tr. at 23.  The second reference is as follows:

> As for the opinion evidence, the undersigned gives weight to the opinions and assessments of the claimant's treating sources and State Agency consultants to the extent they are consistent with the medical record, as a whole, and, therefore, provide support to the undersigned's assessment of her residual functional capacity.  Additionally, the undersigned gives little weight to the mental residual functional capacity assessment prepared by treating and licensed psychiatrist Diana Dale, M.D. because her opinion shows that the claimant has more limitations than the actual medical record, as a whole, indicates.  (Exhibit 26F).

Tr. at 25.  Exhibit 26F refers to the Medical Source Statement: Patient's Mental Capacity that Dr. Dale completed on June 29, 2010.[3]  Tr. at 545-46.

The ALJ did not specify which portions of the "medical record, as a whole"

---

[3]  The only Mental Residual Functional Capacity Assessment in the record was completed by the agency psychologist, Dr. Lewin.

23

conflict with Dr. Dale's assessment.  This lack of specificity precludes any meaningful review by this court.[4]  As claimant notes, Dr. Dale's assessment of Deegan's mental RFC is reasonably consistent with the assessment of Deegan's treating therapist, Mueller.  Mueller opined that Deegan experienced anxiety attacks several times a week, had trouble concentrating, had difficulty with short term memory, had difficulty in focusing, had difficulty in maintaining attention and persistence, and had a limited ability to make good decisions.  In addition, Mueller opined that, in the context of simple, routine, or repetitive tasks in a work setting, Deegan "become[s] anxious almost to the point of disorientation.  When she takes medication for anxiety[, she] has troubles staying awake, alert."  Tr. at 360.

Other than Dr. Dale's and Mueller's opinions and clinical notes, the only portion of the medical record related to Deegan's mental functioning is the opinion of the state psychologist, Dr. Lewin.  As Dr. Dale's and Mueller's opinions appear to be consistent (and the ALJ has not articulated any specific inconsistencies), the ALJ apparently preferred the opinion of the agency, non-examining psychologist over the opinion of Deegan's treating psychiatrist.  The ALJ did not sufficiently explain why she credited the state agency opinion over that of the treating physician.  Moreover, the ALJ's reasoning does not comport with the analysis required by *Wilson.*  *Wilson* requires an ALJ to consider the length of the treatment relationship and the frequency of examination, the

---

4  The Commissioner offers a variety of *post hoc* justifications for the ALJ's evaluation of Dr. Dale's opinions.  As this court has noted repeatedly, the ALJ's decision must stand or fall on the reasons that the ALJ gives for the decision.  Justifications provided by the Commissioner after the ALJ has rendered a decision are not relevant to this court's review.

nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source in determining the weight to be given a treating physician's opinion. There is no evidence in the record that the ALJ conducted such an analysis. Consequently, this case must be remanded to the ALJ for a re-assessment of the weight to be given Dr. Dale's opinion in light of *Wilson*.

Deegan contends that the ALJ erred in three respects in using Dr. Elyaderani's opinion:  (1) the ALJ did not consider all of the limitations found by Dr. Elyaderani in the ALJ's opinion; (2) the adopted limitations from Dr. Elyaderani's opinion that were not justified by the scope of Dr. Elyaderani's treatment of Deegan; and (3) the ALJ failed to identify or analyze the weight to be given to Dr. Elyaderani's opinions.

In assessing Deegan's physical RFC, the ALJ referred to Dr. Elyaderani's opinion in drawing two conclusions.  First, the ALJ described the results of Dr. Elyaderani's examination of Deegan's hands and wrists as evidence that Deegan did not meet the criteria for Listing 1.02(B).  Tr. at 20.  Second, the ALJ cited Dr. Elyaderani's opinion that Deegan did not have any postural limitations secondary to her physical impairments and did not require additional breaks secondary to her pain symptoms during a customary and routine work week.  Tr. at 21-22, 25.  The ALJ cited Dr. Elyaderani's specialty as an orthopedic surgeon to give controlling weight to those opinions.

As claimant asserts, however, the ALJ's opinion assumes that Dr. Elyaderani limited Deegan only in the use of her right upper extremity.  But although Dr. Elyaderani operated only on Deegan's right wrist, he found that both wrists suffered from "a significant amount of CMC arthritis" and noted that Deegan complained of pain in both

25

wrists, although she said that the right wrist was worse.  Tr. at 352.  Dr. Elyaderani limited Deegan to only rarely engaging in fine manipulation and only occasionally handling, pushing or pulling, or engaging in gross manipulation.  He did not specify that he was referring only to Deegan's right upper extremity.  The ALJ's assumption that Dr. Elyaderani referred only to the upper right extremity does not appear to be warranted by the record.

In addition, although the ALJ gave controlling weight to Dr. Elyaderani's opinion regarding Deegan's postural limitations and need for breaks, the record does not justify such reliance.  Dr. Boieru referred Deegan to Dr. Elyaderani for treatment of Deegan's wrist pain.  Dr. Elyaderani examined the range of motion in Deegan's hands, discussed the pain in her wrists, examined her hands for swelling, tested hands for tenderness and hyperextension, and conducted a grind test on the joints of the hands and wrists.  In addition, he ordered x-rays of both Deegan's wrists and discussed Deegan's history of wrist pain.  Dr. Elyaderani also performed the surgery on Deegan's wrists and supervised her post-operative care.  The only mention of Deegan's back in Dr. Elyaderani's notes occurs in his description of Deegan's past medical history:  "She suffers from gastritis.  She's had lithotripsy, hysterectomy, disc issues.  Bipolar, fibromyalgia.  Medications listed in the chart which are quite numerous."  Tr. at 352. There is no indication in the record that Dr. Elyaderani discussed Deegan's back problems, examined Deegan's back, assessed her back problems, or had any medical interest in her back whatsoever.

The Medical Source Statement: Patient's Physical Capacity that Dr. Elyaderani completed asked the treating source the following questions:

26

I.      Are LIFTING/CARRYING affected by impairment?

II.     Are STANDING/WALKING affected by impairment?

III.    Is SITTING affected by impairment? . . .

VII.    Does the patient need to REST for some portion of time during an 8-hour work day?

Tr. at 356-57.  In answering the first question, Dr. Elyaderani noted Deegan's wrist surgery and estimated her ability to lift and carry within three months and within six months.  He simply checked "No" in response to the next to questions and checked a box for breaks at two-hour intervals in response to the final question.  As Dr. Elyaderani was concerned solely with Deegan's wrists and was not in any position to assess her back problems, the only conclusion warranted by the record is that Dr. Elyaderani opined that Deegan's *wrist impairment* did not affect her postural limitations or need for breaks.  Consequently, the ALJ's reliance on Dr. Elyaderani's Medical Source Statement for the conclusion that Deegan had no postural limitations was not reasonable.

For these reasons, this case must be remanded to the ALJ for reconsideration of Deegan's physical limitations considering the entirety of Dr. Elyaderani's opinion in the context of the limits of his treatment of Deegan.  If the ALJ determines that Dr. Elyaderani's opinion regarding limitations on Deegan's upper left extremity should not be given controlling weight, he must give reasons for that determination by conducting the analysis required by *Wilson*.

B.      *Whether substantial evidence supports the ALJ's RFC findings*

Deegan contends that the ALJ's RFC findings were not supported by substantial

evidence because the ALJ (1) failed to include the limits that Dr. Elyaderani placed on Deegan's left upper extremity in his RFC findings; (2) improperly applied Dr. Elyaderani's Medical Source Statement to Deegan's postural limitations; and (3) ignored other evidence in the record regarding Deegan's leg length difference due to hip tilt and x-ray evidence regarding Deegan's arthritis in the lumbar spine and bilateral superior patellar spurring in her knees.

As described above, the ALJ erred in failing to include the limits that Dr. Elyaderani placed on Deegan's left upper extremity in his RFC findings and improperly applied Dr. Elyaderani's Medical Source Statement to Deegan's postural limitations. The ALJ did not ignore x-ray evidence of Deegan's arthritis in her lumbar spine and considered that evidence in determining that Deegan did not meet the requirements of Listing 1.04(C).  *See* tr. at 21.  As regards the difference in Deegan's leg length and spurring in her knees, there is no evidence in the record regarding what limits, if any, these conditions impose on Deegan.  Deegan's contentions with respect to these conditions, therefore, are not well-taken.

## VII.  Decision

For the reasons set forth above, the court REVERSES the decision of the Commissioner and remands the case for (1) re-evaluation of the weight to be given to all of the opinions of Drs. Dale and Elyaderani and (2) a re-assessment of Deegan's physical RFC in light of that re-evaluation.

**IT IS SO ORDERED.**

Date:  June 19, 2013                              s/ *Nancy A. Vecchiarelli*
                                                 Nancy A. Vecchiarelli
                                                 U.S. Magistrate Judge

28